*776 OPINION OF THE COURT
Jack M. Battaglia, J.
This holdover proceeding was commenced by petition and notice of petition each dated September 19, 2001, following a 30-day notice of termination of tenancy dated June 28, 2001. Petitioner seeks to recover apartment E-15 at 80 Greene Avenue, as well as use and occupancy at the rate of $1,087 per month from January 1, 2001. A prior holdover proceeding, commenced on January 16, 2001, was dismissed by Honorable Oymin Chin on June 25, 2001, because petitioner served a rent demand after the notice of termination.
The petition alleges that respondent Jessie Cardwell took possession of the premises pursuant to a lease dated February 14, 1992, and that her right to possession expired on August 31, 2001, the date specified in the 30-day notice. Respondents Tiffany Ann Cardwell, John Doe and Jane Doe are alleged to be “undertenant(s)” of Jessie Cardwell.
The 30-day notice states that Jessie Cardwell is “in material noncompliance of [her] tenancy,” because she permitted Tiffany Ann Cardwell to occupy the premises without petitioner’s prior written approval, and failed to report a change in family composition, apartment occupants or income. The premises are said to be “contained in a housing project specifically set up for the elderly and which has a mortgage aided by government insurance,” and the notice is given pursuant to provisions of the written lease and “HUD Rules and Regulations.” Paragraphs 13, 15 and 16 of the lease, and a “house rider,” are cited, as well as “paragraph 23B and the HUD regulation handbook 4350.3(4-18).”
In a notice of appearance, answer and counterclaim dated November 13, 2001, respondent Jessie Cardwell denied the allegations of the petition and asserted eight affirmative defenses and a counterclaim. The answer alleges, among other things, that Tiffany Ann Cardwell is Jessie Cardwell’s “lawfully adopted daughter,” her “adopted minor daughter, who is also her granddaughter”; that Tiffany is permitted to occupy the premises pursuant to Real Property Law § 235-f; that “Petitioner, its employees and/or agents have had knowledge that the Respondent’s lawfully adopted daughter had lived with Respondent for a number of years, yet took no action,” thereby establishing laches, waiver and estoppel. The counterclaim alleges that “this summary holdover proceeding constitutes frivolous conduct as defined by 22 NYCRR § 130-1.1” and *777 “is a clear attempt to knowingly harass and maliciously injure Respondent, an illiterate and sickly senior citizen.”
Ms. Cardwell moved for summary judgment dismissing the action, which was denied by Honorable Marcia J. Sikowitz in a decision/order dated March 15, 2002. Judge Sikowitz found “questions of fact regarding Tiffany Cardwell’s residence, and what, if any, information the respondent furnished to the petitioner about her adopted daughter Tiffany * * * [and] whether or not the petitioner is correct that a fraud was perpetrated on the petitioner as defined by HUD Handbook 4350.3 Section 5-19b.”
A trial was held before this court on April 8 through April 11. Petitioner presented three witnesses: A1 Weeks, a “field agent” employed by petitioner; Eva Diaz, a “secretary” employed by AMS Realty Company, petitioner’s managing agent, working at the building at 80 Greene Avenue; and Jessica Fernandez-Prada, also employed by AMS, working at its office in Great Neck. Respondent Jessie Cardwell testified, and her daughter, Linda Wilson-Warner, testified on her behalf. The parties submitted posttrial briefs containing their respective legal and factual contentions and arguments.
As described by Judge Sikowitz in her decision/order on the motion for summary judgment, the subject premises is a “HUD Section 202 senior citizen housing unit.” Under the section 202 program, “direct loans are provided by HUD at below market rates to * * * not-for-profit and public entities that agree to provide housing and related facilities for elderly * * * families * * * Rent subsidies, mostly under the Section 8 Program, are provided for all units in the Program.” (Scherer and Fisher-Brandveen, Residential Landlord-Tenant Law in New York § 5:177.) “In general, the Section 8 Program, 42 USC § 1437f, provides federally funded rent subsidies to low income tenants to enable them to rent privately owned units. In the Section 8 Program, the subsidy generally pays for the difference between 30% of the household income and the ‘fair market rent’ * * * or other legally established rent for a unit.” (Id. § 5:96.)
HUD regulations and “handbooks” govern various aspects of section 8 tenancies, including terminations, establishing substantive and procedural requirements. Handbook 4350.3, titled “Occupancy Requirements of Subsidized Multifamily Housing Programs,” is applicable to this proceeding. (The court is using the text of the Handbook as it appears on HUD’s Web site: <http://www.hudclips.org> [accessed July 17, 2002].) The provisions of the Handbook are intended to be mandatory, and *778 are so treated by New York courts. (Jackson Terrace Assoc. v Rice, 142 Misc 2d 438, 440 [Nassau Dist Ct 1988]; Green Park Assoc. v Inman, 121 Misc 2d 204, 205 [Civ Ct, Kings County 1983].) The amount of the rent subsidy is determined by certification and annual recertification. (See, generally, Handbook 4350.3, chs 3, 5.)
In the 30-day notice, petitioner cites paragraphs 13, 15, and 16 of the lease and a “house rider.” Paragraph 13 provides that the tenant, designated previously as Jessie Cardwell, “shall use the premises only as a private dwelling for himselfZherself and the individuals listed on the Certification and Recertification of Tenant Eligibility. The Tenant agrees to permit other individuals to reside in the unit only after obtaining the prior written approval of the landlord.” (The provision was amended in 1995 to underline “after.”)
Paragraph 15 states that:
“Every year around the first day of November, the Landlord will request the Tenant to report income and composition of the Tenant’s household and to supply any other information required by HUD for the purpose of determining the Tenant’s rent and assistance payment, if any. The Tenant agrees to provide accurate statements of this information and to do so by the date specified in the Landlord’s request.”
There is no question that at the time of applying for an apartment, and each year thereafter when presented with the owner’s certification of compliance with HUD’s Tenant Eligibility and Rent Procedures, Ms. Cardwell signed the form, indicating that she was the only person in the household, with no dependents, foster children or attendants.
Paragraph 16 is titled “Reporting Changes Between Regularly Scheduled Recertifications,” and, as amended at some point during the tenancy, requires the tenant to advise the landlord immediately if “[t]he household’s income cumulatively increases by $40 or more a month.” As will appear below, there was no evidence at trial of any increase in Ms. Cardwell’s household income, and no other provision in paragraph 16 appears in any way relevant to this case. The reference in the 30-day notice to a “house rider” must mean the “House Rules” attached to the lease, which include “[n]o boarders.”
The 30-day notice states that the termination is based upon “material noncompliance” with the lease; the notice cites paragraph 23 but not paragraph 25. Under paragraph 23 (b) *779 (1), the landlord may terminate for “material noncompliance”; paragraph 23 (b), as amended, defines that term as including “one or more substantial violations of the lease,” and the “failure of tenant to timely supply all requested information on income and composition or eligibility factors, of the tenant household * * * or to knowlingly [sic] provide incomplete or inaccurate information” (emphasis added). Paragraph 25, as amended, states: “Knowingly giving the Landlord false information regarding income or other factors considered in determining Tenant’s eligibility and rent is a material noncompliance with the lease subject to termination of tenancy” (emphasis added).
The 30-day notice states that the termination is also based upon “the HUD regulation handbook 4350.3 (4-18).” The cited provision of the Handbook states that “[o]wners may evict tenants * * * for * * * material non-compliance with the lease.” (§ 4-18 [c] [1].) The next section of the Handbook states that the “term material noncompliance with the lease includes * * * one or more substantial violations of the lease * * * [and] failure of the tenant to timely supply all required information on the income and composition, or eligibility factors, of the tenant household * * * or to knowingly provide incomplete or inaccurate information.” (§ 4-19 [1], [3].) As is apparent, paragraph 23 of the lease, as amended, tracks sections 4-18 and 4-19 of the Handbook.
The provision in the Handbook cited in the 30-day notice, section 4-18, appears in chapter 4, “Leasing, Deposits and Termination of Tenancy.” Chapter 5, “Recertification, Interim Adjustments, and Termination of Tenancy,” contains provisions dealing with “fraud,” including section 5-19 (b), cited by Judge Sikowitz in her decision on the motion for summary judgment. Although it is stated that “fraud” encompasses “[providing false information * * * [in] material noncompliance with the lease” (§ 5-19 [c]), and that “material noncompliance” by “knowingly” providing false information gives the landlord “authority to pursue eviction in cases of tenant fraud” (§ 5-20 [b]), the precise relationship between the provisions of chapters 4 and 5 is not clear. The intention, however, seems to be that the provisions of chapter 5 on “fraud” are used to determine whether the tenant has “knowingly” provided incomplete or inaccurate information for purposes of the termination provisions of chapter 4. The petitioner apparently shares this view, in that despite the citation to chapter 4 in the 30-day notice, it has argued “fraud” throughout the proceed *780 ings before this court and on the motion for summary judgment. (See affirmation in opposition of David I. Paul, Esq.) The provisions of chapter 5 on “fraud” are discussed below.
Evidence at Trial
Jessie Cardwell was 64 years old when she moved to 80 Greene Avenue in February 1992. She had been living in a third-floor walk-up, but, after heart surgery, needed an apartment in a building with an elevator. According to the section 8 certifications, her entire income has come from Social Security and she has no other assets. As stressed by her counsel, the highest level of formal education she achieved was the third grade. She uses a wheelchair, but it is not clear that she is wheelchair-bound.
Tiffany was five years old in February 1992. Her mother, Jessie Cardwell’s daughter, was ill and eventually died in 1999. Her father, who was not married to her mother, had apparently died before 1992. Jessie Cardwell adopted Tiffany in February 1993. She explained at trial that a social worker had told her that, if she did not adopt Tiffany, she would be taken from her. Petitioner’s witnesses testified that they did not learn that Tiffany was Ms. Cardwell’s adopted daughter until recently, and Ms. Cardwell did not contradict them.
Ms. Cardwell maintains that she told Eva Diaz when she applied for the apartment that Tiffany would be living with her, and that Ms. Diaz told her that Tiffany could be named as an occupant or not as Ms. Cardwell pleased. Ms. Cardwell testified that she told Ms. Diaz that, since Tiffany would not be remaining in the apartment if anything happened to Ms. Card-well, she wouldn’t list her. She remembers Ms. Diaz joking with Tiffany about whether Tiffany had a job. No mention was made of any other apartments or buildings in which Ms. Card-well might live with Tiffany.
Eva Diaz’s testimony is consistent with Ms. Cardwell’s up to a point. She testified that she never told Ms. Cardwell that she didn’t have to list Tiffany, but she also never told Ms. Cardwell directly that she did. Consistent with Ms. Cardwell’s testimony, Ms. Diaz testified that it was up to Ms. Cardwell to list Tiffany or not, and up to the main office to follow up when Ms. Diaz supplied information (as she did) that the tenant’s submission was inaccurate. But Ms. Diaz denies that Ms. Cardwell told her at the beginning that Tiffany would be living with her.
Ms. Cardwell and Ms. Diaz agree that, for the most part, all dealings between petitioner or AMS Realty and Ms. Cardwell *781 with respect to the lease and recertifications were between the two women. (The exceptions were the letters and more recent telephone conversations described below.) Ms. Cardwell testified that she told Ms. Diaz that she had difficulty reading and didn’t understand the documents she was asked to sign. Ms. Diaz explained that she relied on Ms. Cardwell’s daughter Linda to read and explain the documents to Ms. Cardwell as necessary. However, Ms. Cardwell testified that Linda was “seldom around,” and Ms. Wilson-Warner testified that she never saw any of the papers that her mother signed indicating that Ms. Cardwell was the only occupant of the apartment. Ms. Wilson-Warner said that the first holdover proceeding provided the first notice to her that only her mother was listed as a tenant.
The documentary evidence establishes that, each year at the time for recertification, Ms. Cardwell signed a notarized statement that notified petitioner through AMS Realty that she was the only person living in the household, and that, virtually from the day she moved in, employees of the managing agent had concluded that the information was incorrect. In forwarding recertification information and documents to AMS Realty’s office, Ms. Diaz would attach notes reading: “This tenant * * * has kid in apt living with her since she came to live in here” (Oct. 13, 1994); “has granddaughter living with her since she been here like a tenant” (Oct. 20, 1994); “granddaughter living with her since 1992” (Dec. 29, 1997). (Moreover, each of these notes stated that the child attended private school.) Even earlier, when Ms. Cardwell signed a window guard notice in July 1993, Ms. Diaz wrote on top “she has child and don’t wants [sic] to mark none of them,” referring to the sections of the form that would indicate whether or not a child under 10 years old was living in the apartment. Ms. Diaz confirmed in her testimony having written these notes and their import, and Ms. Fernandez-Prada confirmed in her testimony having received them.
Apparently in response to the information received from Ms. Diaz, AMS Realty would write to Ms. Cardwell. On October 21, 1994, Ms. Fernandez-Prada wrote: “The apartment is for yourself and your immediate family (i.e. spouse, children) only. We will not add the additional people on your Certification * * * ” (Emphasis in original.) Similar letters were written by another AMS Realty employee, Donna Ramos, on October 16, 1996 and October 24, 2000, although these letters state: “The apartment is for yourself.” On October 27, 1997, Ms. Ramos *782 wrote: “We have reason to believe your granddaughter is living with you.” And three years later: “We have been informed that you still have a Stephanie living with you.”
Ms. Diaz testified that Ms. Cardwell always maintained that Tiffany was not living with her; but Ms. Diaz didn’t believe her; Ms. Diaz knew Tiffany was living with Ms. Cardwell. (Indeed, Ms. Cardwell testified that, at Ms. Diaz’s insistence, the window guards were installed because she had Tiffany.) Ms. Fernandez-Prada also testified that Ms. Cardwell maintained that Tiffany didn’t live with her, but Ms. Fernandez-Prada only spoke to Ms. Cardwell once.
There is some documentary evidence that supports the testimony that Ms. Cardwell responded to any inquiry by maintaining that Tiffany did not live with her. There is a letter dated October 20, 1994, signed by Ms. Cardwell and notarized, that states: “I live in my apartment alone!” Ms. Cardwell acknowledges her signature, but could not provide any information concerning the circumstances of the letter, although she said that she didn’t prepare it.
Also, Ms. Cardwell’s daughter, Linda Wilson-Warner, wrote a letter on December 4, 2000 to Donna Ramos, stating that Tiffany lived with her and always had. At trial, Ms. Wilson-Warner acknowledged that the letter (and an enclosed school application) were false. She explained that the letter was written in panic, in an attempt to protect her mother, after receipt of the papers in the first holdover proceeding, and after a conversation with Ms. Ramos in which Ms. Ramos insisted that Ms. Cardwell would be evicted if Tiffany did not leave. Although certainly not to be commended, given its date the letter cannot provide support for any contention by petitioner that it was prevented from learning the truth by any misrepresentation in the letter.
Petitioner’s policies concerning occupancy of the apartments at 80 Greene Avenue are somewhat indefinite. Although all of petitioner’s witnesses testified that the project is maintained for senior citizens only, they all also testified that children of senior citizens have lived with their parents, and Mr. Weeks testified that at least sometimes the occupancy was with the petitioner’s approval. Mr. Weeks said that, although petitioner “discourages” occupancy by the minor children of seniors, “exceptions” have been made on a case-by-case basis; he did not know, however, the considerations that were used to determine whether approval would be granted.
Mr. Weeks also acknowledged that, presented with a wheelchair-bound senior who wished her adopted daughter to *783 live with her, it was “possible” that petitioner would make an “exception” and approve the daughter’s occupancy. He maintained, however, that petitioner would not certify any additional occupant when the person’s presence was not reported by the tenant.
Both Ms. Diaz and Ms. Fernandez-Prada testified that minor children have been certified to occupy premises at 80 Greene Avenue. One situation described by Ms. Fernandez-Prada is similar to this case; a granddaughter was certified when the grandmother was granted custody after the death of the child’s mother. (They have apparently been placed on a wait list for premises in another building owned by petitioner.) Ms. Diaz also testified that, in at least two apartments, adult children are living with their parents, with the knowledge of the “main office.”
Ms. Fernandez-Prada acknowledged that Tiffany’s occupancy of Ms. Cardwell’s apartment would not constitute overcrowding under HUD regulations and would not otherwise violate HUD restrictions on sharing a bedroom. She testified generally to the importance to seniors of avoiding the “nuisance” that might be created by minor children, but could not remember any complaint that had been made about Tiffany. Ms. Diaz testified to a complaint in 1993 about “all of the kids” who were then living at 80 Greene Avenue, but testified to nothing more recent or specifically about Tiffany (who would have been six years old at the time).
Occupancy Restrictions
As noted, the 30-day notice stated that Ms. Cardwell was in “material noncompliance” with the lease in that she permitted Tiffany to occupy the premises without petitioner’s prior written permission. Also, the HUD Handbook permits termination of the tenancy for a “material noncompliance,” defined to include “one or more substantial violations of the lease.” (See discussion above.)
In its posttrial memorandum of law, petitioner appears to rely exclusively on fraud as the basis for the termination, referring to no lease provisions but citing and quoting from the HUD Handbook on fraud. However, as one of two alleged consequences of the fraud, petitioner states: “If the tenant had admitted to caring for a child in the premises she would not have been allowed to move in the premises.” (The posttrial memorandum contains neither paragraph nor page numbers to allow reference.) Therefore, even if petitioner were deemed to have abandoned any argument based on the occupancy itself, *784 as opposed to any alleged falsity concerning it, the legitimacy of an exclusion on that basis is clearly at issue. Whether viewed as an independent ground, or in its relationship with the alleged fraud, the occupancy restrictions in the lease on the facts here cannot support termination of the tenancy.
Petitioner quotes section 2-4 (a) from the Handbook: “For projects or parts of projects designed for the elderly, owners may restrict occupancy for elderly units to persons 62 years of age and older, and to families, where the head of the household or spouse is 62 years of age or older” (emphasis added). Ignoring the conjunctive, petitioner argues that HUD permitted exclusion of Ms. Cardwell if Tiffany would be living with her. There is more evidence than one “and,” however, that petitioner is incorrect.
Thus, “[o]ccupancy of [section 202] projects is limited to elderly individuals 62 years of age or older and to families where the head of household or spouse is 62 years of age or older * * * .” (Handbook § 2-4 [b].) Section 2-9 prescribes eligibility requirements for section 202 projects funded before October 1991 (which 80 Greene Avenue presumably is), and refers to the definition of “elderly family” that includes “[a] single person who is 62 years of age or older” and “[flamilies of two or more persons one of whom is 62 years of age or older.” (Handbook § 2-9 [c] [1], exhibit 2-1 [e] [1] [a], [c].)
Perhaps more importantly:
“If the head of a household or spouse is six-two years of age or older, and the family is denied admission to such elderly units * * * because of familial status, the failure to admit the family would constitute discrimination proscribed by the Fair Housing Act, unless the housing is exempt from the applicability of the familial status provision. The Department will not designate its elderly programs or projects under Section[] 202 * * * for an exemption from the familial status provision, since HUD policy precludes families which otherwise qualify for elderly housing, from being denied admission to an elderly project based on familial status.” (Handbook § 2-4 [e]; see also Fair Housing Act, 42 USC § 3602 [k] [2002].)
For purposes of the Act, “familial status” is defined as “one or more individuals (who have not attained the age of 18 years of age) being domiciled with * * * a parent or another person having legal custody of such individual or individuals.” (42 USC § 3602 [k] [1].)
*785 Similar prohibitions against discrimination are part of New York law. (See Executive Law § 292 [26]; § 296 [5] [a]; Real Property Law § 236.) Although the New York statutes provide for exemptions to accommodate federally funded senior citizen housing, they are not likely to be interpreted to be inconsistent with HUD policy.
In addition to the provisions of antidiscrimination law, Real Property Law § 235-f (3) provides that “[a]ny lease or rental agreement for residential premises entered into by one tenant shall be construed to permit occupancy by the tenant, immediate family of the tenant, one additional occupant, and dependent children of the occupant * * * .” The tenant is required to “inform the landlord of the name of any occupant within thirty days following the commencement of occupancy by such person or within thirty days following a request by the landlord.” (Real Property Law § 235-f [5].) Soon after these provisions became effective on June 30, 1983 (pursuant to L 1983, ch 403, § 64), they were held to apply to section 8 tenancies, and a tenant was found not to be in material noncompliance with the terms of his lease when he permitted an additional occupant to enter the premises. (See Marine Terrace Assoc. v Zeimbekis, 122 Misc 2d 921 [Civ Ct, Queens County 1983].) The opinion does not indicate whether the tenant informed the landlord of the occupancy.
Respondent also points to paragraph 21 of the lease, in which the “Landlord agrees not to discriminate based upon * * * age, * * * or because there are children in the family.” At trial, Ms. Fernandez-Prada attempted to discount the import of this provision by stating that petitioner used the same form of lease for all of its buildings, including those that are not intended as senior housing. Nonetheless, the provision is part of the lease that governs this tenancy, and must be taken into account in determining whether there has been a “substantial violation” of the lease. “Classic lease construction is that if there are any ambiguities in lease interpretation, making two constructions possible, any such ambiguities are to be resolved in the tenant’s favor * * * Moreover, the interpretation should be adopted that limits restrictions on the free use of property.” (Mihil Co. v Paradiso, 107 Misc 2d 867, 871 [Civ Ct, NY County 1980].)
In the absence of further direction in HUD regulations, whether there has been one or more “substantial violations” of the lease is to be determined by state law. (North Shore Plaza Assoc. v Guida, 117 Misc 2d 778, 779-780 [Civ Ct, Richmond County 1983].) In addition to proving that “a tenant violated a *786 substantial obligation of the lease * * * a landlord must also demonstrate that the violation of such obligation was a significant one — i.e., not a technical or a de minimis violation.” (Park W. Vil. v Lewis, 62 NY2d 431, 437 [1984].) “[P]roof of actual harm or lack thereof’ is one consideration. (Id. at 438 n 3; see also Matter of Park E. Land Corp. v Finkelstein, 299 NY 70, 75-76 [1949] [restriction on occupancy].) There is no evidence that Tiffany’s occupancy of Ms. Cardwell’s apartment has caused petitioner any actual harm.
Specifically with respect to occupancy restrictions, antidiscrimination laws and Real Property Law § 235-f have led courts to conclude that there had been no “substantial violation” of the lease, in some cases even though the landlord was not informed. (See Mainstay Coop. Section Two v Hroch, 105 AD2d 695 [2d Dept 1984]; 61 Jane St. Assoc. v Kroll, 102 AD2d 751 [1st Dept 1984]; 420 E. 80th Co. v Chin, 97 AD2d 390 [1st Dept 1983]; Evangelista Assoc. v Bland, 117 Misc 2d 558, 559 [Civ Ct, Queens County 1983]; Leonedas Realty Corp. v Brodowsky, 115 Misc 2d 88, 90-91 [Civ Ct, Queens County 1982].) In such a case involving “an individual, residing in demised accommodations for the principal purpose of rendering necessary health services to the tenant,” Appellate Term stated:
“[W]e are mindful of a growing class of older persons in our midst who, afflicted by the ravages of time, suffer from debilitating and chronic illnesses. To consign these individuals, absent medical necessity and against their wishes to institutions in order to receive proper health care rather than seek such care at home at the peril of being evicted, violates our notion of justice.” (King v Menachem, 113 Misc 2d 63, 66 [App Term, 2d Dept 1981].)
If more be needed, there is sufficient evidence of petitioner’s awareness of Tiffany’s occupancy to support a waiver or estoppel. (See Park Holding Co. v Power, 161 AD2d 143, 145 [1st Dept 1990]; John C. v Martha A., 156 Misc 2d 222, 227 n 4 [Civ Ct, NY County 1992]; Kalimian v Olson, 130 Misc 2d 861, 867-868 [Sup Ct, NY County 1986].) These issues are discussed more fully below, where they are of more immediacy. Here it is enough to note their relevance to any argument based on Tiffany’s occupancy in itself.
Inaccurate Information/Fraud
The conclusion is inescapable that Tiffany’s occupancy cannot in itself be the basis for termination of Ms. Cardwell’s *787 tenancy. Nor can it be said that petitioner suffered from any related “fraud,” in that “[i]f the tenant had admitted to caring for a child in the premises she would not have been allowed to move into the premises,” since it is apparent that she could not have been refused on that ground.
The only other consequence of the “fraud” that petitioner cites is that it “was denied the opportunity to question the income of the child. For example, testimony was adduced that the child was going to a private school. This would be considered income and might have decreased the subsidy.” (Petitioner’s posttrial mein of law.) Although the court specifically requested that the parties address in their posttrial submissions whether and how Ms. Cardwell’s subsidy would have been affected had Tiffany’s presence been taken into account, petitioner provides no explanation or authority for its contention. The reason may be that the factual predicate is weak, the only evidence on the issue being that Tiffany has been attending parochial school, coupled with the assertion that, generally, parochial schools charge tuition. On the other hand, Ms. Cardwell has made a showing that, because of an allowance for dependents, her “share of the rent would have been less had she been given proper credit for her adopted daughter in the annual recertification required by HUD.” (Post-trial mem, at 10-11.)
It may be, however, that, assuming “fraud,” it doesn’t make any difference whether Ms. Cardell’s tenancy would have in any way been affected if she had listed Tiffany on the initial and annual certification documents. It may be that, if Ms. Card-well did indeed “knowingly” provide inaccurate information about family composition, that it is enough to warrant her eviction. First, however, “fraud” must be found, and, as noted, that appears to be determined, at least in part, by chapter 5 of the Handbook.
“Fraud is deceit or trickery deliberately practiced in order to gain some advantage dishonestly. Fraud is an intentional deception; it cannot be committed accidently.” (Handbook § 5-19 [b].) As at common law, fraud can result from both “intentionally misstating or withholding some material information.” .(§ 5-19 [d] [2].) The Handbook recognizes that determining “intent” is “hardly what could be called a science,” and requires an appreciation of the “qualitative difference between circumstances and intentions from one situation to another.” (§ 5-20 [e], [f].) Specifically, “many of the tenants assisted under the housing payments assistance programs may *788 have difficulty with language and/or marginal educational backgrounds and may be confused by the paperwork process.” (§ 5-21 [g].)
But once fraud is found, “the authorized course of action for owners to take is termination of tenancy.” (Handbook § 5-20 [b].) “The severity of an offense, or even the effect on a tenant’s income eligibility for assistance, has no further consideration.” (§ 5-20 [a].)
The last quoted provision from the Handbook brings to prominence the question of whether and to what extent the principles of common-law fraud apply to determining “fraud” for purposes of terminating a section 8 tenancy. The statement that “[flraud is fraud by legal definition, as set forth in paragraph 5-19, and there is no need for further qualification” (Handbook § 5-20 [a]), is ambiguous, pointing in the direction of the “legal definition” and in the direction of section 5-19, suggesting they are the same, but the provision apparently making irrelevant any consideration of effect would belie any equivalency.
At common law,
“in order to sustain an action for fraud, the plaintiff! ] must prove (1) that the defendant made a representation, (2) as to a material fact, (3) which was false, (4) and known to be false by the defendant, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity, (8) to his injury.” (lannucci v Viscardi, 251 AD2d 379, 379 [2d Dept 1998] [emphasis added].)
The Handbook says that “fraud” is “deception” (supra). “A false representation is not cognizable by the law as deceit unless it is believed and relied upon as an inducement to action.” (Ochs v Woods, 221 NY 335, 338 [1917].) A statement that is not in fact believed cannot deceive. (See id. at 339; see also Giurdanella v Giurdanella, 226 AD2d 342, 343 [2d Dept 1996]; Fortes v Estate of Magoon, 160 AD2d 756, 758 [2d Dept 1990] [“If (plaintiffs) knew of the falsity * * * , the plaintiffs will be unable to sustain their action sounding in fraud”]; Magalnick v Empire State Mut. Life Ins. Co., 13 Misc 2d 468, 468 [App Term, 2d Dept 1958] [“(D)eception * * * is prerequisite in an action for damages for fraud”].)
Moreover, there is no fraud if the plaintiff “had the means available to [it] of knowing by the exercise of ordinary intelligence, the truth or the real quality of the subject of the *789 representation.” (Madison Home Equities v Echeverria, 266 AD2d 435, 435 [2d Dept 1999], quoting Schumaker v Mather, 133 NY 590, 596 [1892].) A plaintiff “may not put faith in representations * * * which are shown by facts within his observation to be so patently and obviously false that he must have closed his eyes to avoid discovery of the truth.” (Corva v United Servs. Auto. Assn., 108 AD2d 631, 632-633 [1st Dept 1985], quoting Prosser, Torts § 108, at 716 [4th ed].)
These principles were applied to a landlord’s claim for fraud based upon the tenants’ representations “in obtaining a commercial apartment for their residential use.” (Sylvester v Bernstein, 283 App Div 333, 334 [1st Dept], affd 307 NY 778 [1954].)
“Assuming that landlord did not know at the time she made the lease with tenants that the occupancy was to be exclusively residential, * * * she either acquired that knowledge or * * * she should have known the facts for at least the year for which excess rent was recovered.
“Thus, for the purposes of this case it is not material whether the actual or equivalent knowledge of the facts coincides chronologically with the making of the lease. If such knowledge was acquired thereafter, and the landlord continued with the arrangements by continuing to accept the prohibited rent, the fraud was waived, at least to the extent that the remedy of rescission was involved * * * “Consequently, landlord has lost the right to evict the tenants, even assuming that the tenants obtained possession of the apartment by fraudulent representations.” (Id. at 337.)
It is a “settled principle that acceptance of rent by a landlord from a tenant with knowledge of the tenant’s violation of the terms of the lease normally results in a waiver of the violation.” (Jefpaul Garage Corp. v Presbyterian Hosp. in City of N.Y., 61 NY2d 442, 447 [1984]; see also Witkoff v Shopwell, Inc., 112 AD2d 295, 296 [2d Dept 1985].) Similarly, renewal of the lease with “constructive knowledge, because the exercise of reasonable diligence would have produced actual knowledge,” may estop the landlord from terminating the tenancy based upon the violation. (Kalimian v Olson, supra at 867-868.) Where federally subsidized housing is concerned, the applicability of these principles appears to be controlled by state law. (See Dunbar Hous. Auth. v Nesmith, 184 W Va 288, 291, 400 SE2d 296, 299 [1990] [collecting cases].) New York courts have ap *790 plied them to section 8 and other federally subsidized housing. (See Hudsonview Co. v Jenkins, 169 Misc 2d 389 [Civ Ct, NY County 1996]; Morrisania II Assoc. v Harvey, 139 Misc 2d 651, 663 [Civ Ct, Bronx County 1988]; Greenwich Gardens Assoc. v Pitt, 126 Misc 2d 947 [Nassau Dist Ct 1984].)
However, “[a] waiver may not operate so as to infringe on the rights of others, or to violate public policy.” (Hudsonview Co. v Jenkins, supra at 392 [illegal use]; Hempstead Hous. Auth. v Wells, 155 Misc 2d 873, 876-877 [Nassau Dist Ct 1992] [same]; Crossroads Apts. Assoc. v LeBoo, 152 Misc 2d 830 [Rochester City Ct 1991] [section 8/“no pet clause”]; Mobil Oil Corp. v Burdo, 69 Misc 2d 153, 158 [Suffolk Dist Ct 1972].) “[T]he fraud perpetrated on the public is of such a serious nature as to justify eviction * * * Even if the landlord had wanted to, it could not have waived such breach even by express waiver.” (Burdo at 158.) “[T]o hold that the owner’s inadvertent or deliberate acceptance of rent after commission of an illegal act could operate to waive the illegality * * * would be an open invitation to bribery or intimidation of a landlord or managing agent, or collusion between the parties to the detriment, of the community.” (Hudsonview Co. v Jenkins, supra at 393.)
In our case, there can be little doubt that petitioner should have known — if in fact it did not actually know — that Tiffany was living with Ms. Cardwell, and that, therefore, the information she was providing was inaccurate. Other than the occasional denial, there was no evidence that Ms. Cardwell concealed Tiffany’s presence; indeed, her presence was both “open” and “notorious.” (See Park Holding Co. v Power, supra at 145; see also Kalimian v Olson, supra at 868.) As to the denials, Ms. Diaz testified that she didn’t believe them, and she certainly made the main office aware on a regular basis.
Petitioner is deemed to know what Ms. Diaz and other employees of its managing agent knew. (Dollard v Roberts, 130 NY 269, 273-274 [1891]; Lesnick & Mazarin v Cutler, 255 AD2d 367 [2d Dept 1998]; Smalls v Reliable Auto Serv., 205 AD2d 523, 524 [2d Dept 1994].) This knowledge would support conclusions that there was no “deception,” and that the violation of the lease by submission of inaccurate information was waived. And it is the “material noncompliance” provision of the lease— specifically, “knowingly providing inaccurate information”— that is the basis for the landlord’s “authority to pursue eviction in cases of tenant fraud.” (Handbook § 5-20 [b].)
But the Handbook makes clear that, “[w]hen fraud, by legal definition, is present, the authorized course of action for own *791 ers to take is termination of the tenancy.” (Id.) “The severity of an offense, or even the effect on a tenant’s income eligibility for assistance, has no further consideration.” (Handbook § 5-20 [a].) It is not clear that the landlord is required to terminate the tenancy by these provisions. It would have been easy enough to say so, rather than saying “authorized,” which is different. In any event, it is apparent that, once found, “fraud” is sufficiently serious that the common law of fraud and waiver, developed in the context of private transactions, should be applied with caution if the tenant is to be relieved of the consequences. After all, a tenant “who is declared eligible [for section 8 benefits] retains a very exclusive and valuable right.” (Marine Terrace Assoc. v Zeimbekis, supra at 923.)
In a case involving a surviving family member’s right to succeed to a tenant based section 8 subsidy, the Court of Appeals held in Matter of Evans v Franco (93 NY2d 823, 825 [1999]):
“Given the 13 unequivocal annual statements by the deceased that she lived in the apartment alone, there is no basis on this record to conclude that petitioner is a family member or that a hearing is necessary to confirm his status. To permit petitioner to claim status as a surviving family member would be to open the door to possible fraudulent claims and to a wholesale disregard of the intent of the subsidy program.”
Lower courts have since disagreed on whether the failure to list the claimant on the deceased tenant’s certification is also fatal in the case of a project based subsidy. (Compare Greene Ave. Assoc. v Reape, 182 Misc 2d 379, 383-384 [Civ Ct, Kings County 1999], with Sunset Hous. Assoc. v Caban, 190 Misc 2d 343, 346-348 [Civ Ct, Kings County 2001].) Policy implications identified in that context are relevant here:
“[T]o hold that [claimant] and those similarly situated might succeed to possession of such apartments would render toothless the statutory requirement that tenants report household composition and income. Such a result would also significantly hamper landlords in both the exercise of their right and the fulfillment of their statutory duty to ensure that those to whom they rent section 8 subsidized apartments meet section 8 program standards. Further, to hold that [claimant] and those who are similarly situated might succeed to possession of such apartments would unfairly allow them to cut *792 in line ahead of those who have spent many years on waiting lists hoping to become tenants of section 8 subsidized apartments.” (Id. at 348.)
Family composition in particular has additional implications for the character of the project. Senior housing, subsidized or not, is desirable for many of those eligible because of a quality of life, comfort and companionship that may be unavailable in other premises. That is why housing that meets qualifying standards is exempt from federal and state antidiscrimination laws that, if applicable, might adversely affect that character.
But there are countervailing policies as well. “The section 8 program recognizes the entire family as the tenant, entitled to occupancy and assistance. It thereby encourages family cohesion and the care of the elderly and disabled in the home.” (Morrisania II Assoc. v Harvey, supra at 655-656.) In Brooklyn, at least, families include grandmothers who care for their minor grandchildren. At 80 Greene Avenue alone, there are at least two grandmothers who are each caring for a minor child of a deceased daughter. The obvious interests of those children in a stable, loving home cannot be ignored in the implementation of a social welfare statutory scheme.
Moreover, eviction may be “so disproportionate to the violation as to be shocking to one’s sense of fairness.” (Matter of Cuevas v Beacon Hous. Auth., 220 AD2d 179, 182-183 [3d Dept 1996].) “[A] result is shocking to one’s sense of fairness if the sanction imposed is so grave in its impact on the individual subjected to it that it is disproportionate to the misconduct, incompetence, failure or turpitude of the individual, or to the harm or risk of harm to the agency or institution, or to the public generally visited or threatened by the derelictions of the individuals.” (Matter of Pell v Board of Educ. of Union Free School Dist. No. 1, of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 234 [1974].)
It would be shocking to one’s sense of fairness if the statement in the Handbook that the “severity of an offense, or even the effect on a tenant’s income eligibility for assistance” cannot be considered in determining an appropriate course of action once “fraud by legal definition” is found (Handbook § 5-20 [a]), was given literal and universal application. At the least, countervailing considerations of policy and fairness demand that any finding of “fraud” be scrupulously made. Indeed, the Handbook itself notes the “qualitative difference between circumstances and intentions from one situation to another” and that “sanctions and corrective courses of action are designed accordingly.” (Handbook § 5-20 [f].)
*793 The question becomes then: did Ms. Cardwell commit “fraud” by “knowingly providing incomplete or inaccurate information” about family composition? Again, “[flraud is deceit or trickery deliberately practiced in order to gain some advantage dishonestly.” (Handbook § 5-19 [b].) The term “knowingly” is not defined. Indeed, the term is used only once in the Handbook’s provisions on “fraud”; instead the Handbook prefers “intentional.” (See Handbook §§ 5-19, 5-20, 5-21, passim.)
The court concludes that, at the time she applied for and took possession of the premises, Ms. Cardwell did not “knowingly” or “intentionally” provide incomplete or inaccurate information to petitioner. Ms. Cardwell testified that, at the time, she believed that it was not necessary to list Tiffany on the certification, and that the only purpose for listing her would have been to provide Tiffany some entitlement to occupancy should something happen to Ms. Cardwell. Ms. Diaz’s testimony as to her role in the certification/recertification process supports, if it does not actually corroborate, Ms. Cardwell’s account.
There came a time, however, when Ms. Cardwell must have become aware that Tiffany’s presence in the apartment was an issue. AMS Realty’s first letter, dated October 21, 1994, would not have been that event, as the letter suggested that, as a member of Ms. Cardwell’s immediate family, Tiffany was a permitted occupant. That this letter may have been a form that AMS Realty used for all section 8 tenants, as was the testimony, is irrelevant; it was the letter sent to Ms. Cardwell, and there is no reason to discount any effect that it may have had on her mind.
The subsequent letters dated October 16, 1996, October 27, 1997, and October 24, 2000 were unqualified: no one other than Ms. Cardwell was permitted to live in the apartment, and no one else would be added to the section 8 certification. We cannot know for certain what Ms. Cardwell thought in response to these letters, because she did not testify to it. The absence of any consequence to the letters over a nine-year period until the fall of 2000 must have had some effect on her mind and conduct, particularly since she reasonably believed that Ms. Diaz and her employer knew the facts. The issue here is not deception or waiver — i.e. the state of mind of petitioner’s agents — but Ms. Cardwell’s state of mind — i.e. whether she acted “knowingly,” “deliberately,” “intentionally.”
Other conclusions are fairly inescapable. On at least one occasion, the October 20, 1994 letter, Ms. Cardwell stated categorically that she lived in the apartment alone; the infor *794 mation was inaccurate, she knew it was inaccurate, and it was apparently given in response to an inquiry about Tiffany’s presence in the apartment. Ms. Cardwell acted from a determination that Tiffany not be taken from her and that they not lose their home. There is no evidence to suggest that petitioner ever said anything to Ms. Cardwell about income eligibility or the amount of her subsidy, or that Ms. Cardwell would have harbored any concern about “imputed income.” Although petitioner’s witnesses maintained that, had they been told about Tiffany, they would have found other suitable premises for Ms. Cardwell and Tiffany, Ms. Cardwell testified without contradiction that no one ever gave her any such assurance. To the contrary, the only evidence, the AMS letters, threatened that Tiffany or Ms. Cardwell, or both, would have to leave, notwithstanding, as demonstrated above, that the threats were illegal.
In an unreported decision, Starret City v Hamilton (NYLJ, Feb. 21, 1991, at 27 col 6), the Appellate Term, Second Department, addressed a landlord’s claim that a section 8 tenant misrepresented the amount of her income when applying for the apartment.
“Evidently, tenant misrepresented her financial situation in the belief that landlord discriminated against welfare recipients and that if she did not do so she would not be given an apartment. As a result of her misrepresentation, tenant received less of a federal rent subsidy than that to which she was actually entitled.” (Id.)
The proceeding was for nonpayment, after the landlord terminated the rent subsidy, because of the tenant’s fraud on her income certification, and raised her rent to fair market levels. HUD Handbook 4350.3 provided that a ground for termination of the federal subsidy was the deliberate submission by the tenant of “false information on any application * * * for the purpose of obtaining a higher assistance payment or lower rent * * * .” (Id.) Appellate Term held that the Handbook did not allow termination of the subsidy. “Tenant’s misstatements do not fall within this definition because they were not for the purpose of obtaining a higher assistance payment or lower rent and, in fact, resulted in her receiving a lower assistance payment and higher rent than that to which she was actually entitled.” (Id. at 28, col 1; see also Green Park Assoc. v Inman, supra at 208 [concerning an “unauthorized occupant,” where “even were the allegations true, the *795 presence of (the occupant) would not have required (the tenant) to move”].)
Here, although it appears that Ms. Cardwell too would have been entitled to a higher subsidy if she had accurately reported to the landlord, she is not charged with providing false information about income (at least not directly), and the applicable provisions of the Handbook do not define “fraud” in terms of the amount of the subsidy; to the contrary, the Handbook says that the “effect on a tenant’s income eligibility for assistance” need not be considered. (Handbook § 5-20 [a].) But, taking the cue from Appellate Term, this court concludes that Ms. Card-well did not submit inaccurate or incomplete information “in order to gain some advantage dishonestly” (Handbook § 5-19 [b]), but rather to avoid an unlawful and discriminatory refusal by the landlord to recognize Tiffany as a permitted occupant of the premises.
Having failed to establish the tenant’s “fraud” or her “material noncompliance” with the terms of her lease, petitioner has not shown that it is entitled to possession of the premises, and the petition is dismissed.
The counterclaim is also dismissed. Except for Appellate Term’s unreported decision in Starret City v Hamilton (supra), the court is not aware of any case law on the use of fraud as the basis for terminating a section 8 tenancy. Although the court has found that petitioner’s position in this case is not supportable, it cannot be characterized as frivolous.